23943

The STATE, Respondent v. Richard LONGWORTH, Appellant.

(438 S.E. (2d) 219)

Supreme Court

*South Carolina Office of Appellate Defense* and *John H. Blume,* of *South Carolina Death Penalty Resource Center,* Columbia, *for appellant.*

*Attorney Gen. T. Travis Medlock, Chief Deputy Atty. Gen. Donald J. Zelenka, Sr. Asst. Atty. Gen. Harold M. Coombs, Jr.,* and *Asst. Atty. Gen. Norman Mark Rapoport,* Columbia, and *Sol. Holman C. Gossett,* Spartanburg, *for respondent.*

Heard June 8, 1993.

Decided Oct. 25, 1993. Reh. Den. Jan 5, 1994.

MOORE, Justice:

Appellant was convicted of kidnapping, armed robbery, and two counts of murder in connection with the deaths of Alex Hopps and James Todd Greene, employees of the Westgate Mall Cinema in Spartanburg. Appellant was sentenced to death for the murders and kidnapping plus twenty-five years for armed robbery.[1] We affirm.

## JURY ISSUES

Appellant moved for a change of venue based on pretrial publicity. The State agreed appellant should not be tried by a Spartanburg County jury and consented to selection of a jury in another county pursuant to S.C. Code Ann. § 17-21-85 (Supp. 1992). This statute provides in part:

> A circuit judge may, in a criminal case in which he determines that an unbiased jury cannot be selected in the county in which the defendant was indicted, order that jury selection go forward in some other county and the jury, when selected, be transported to the county in which the indictment was returned for the duration of the trial.

The trial judge ruled that jury selection would be held in York County and the jury transported to Spartanburg for trial. Appellant objected to this procedure "based upon the inherent psychological pressure which jurors would face if they are essentially taken from their homes and brought to this county where everyone around them knows something about the case ... and they are the only ones who don't."

A motion for change of venue is addressed to the sound discretion of the trial judge and his ruling will not be disturbed absent an abuse thereof. *State v. Caldwell*, 300 S.C. 494, 388 S.E. (2d) 816 (1990); *State v.*

---

[1] Appellant's co-defendant, David Rocheville, was convicted in a separate trial and sentenced to death. *See State v. Rocheville,* — S.C. —, 425 S.E. (2d) 32 (1993).

*Copeland,* 278 S.C. 572, 300 S.E. (2d) 63 (1982). Transfer of a jury pursuant to § 17-21-85 is similar in effect to a change of venue and is subject to the same scope of review. Further, it is the defendant's burden to demonstrate actual juror prejudice as a result of pretrial publicity. *State v. Caldwell, supra.*

Here, we find no abuse of discretion in the trial judge's decision to transfer a jury to Spartanburg pursuant to § 17-21-85. Appellant has failed to show the jury was tainted by any actual juror prejudice from pretrial publicity.

■ Appellant further contends the trial judge failed to consider the statutory factors necessary to transfer a jury pursuant to § 17-21-85. The statute requires the trial judge consider:

> all the logistical and expense elements and, consistent with the demands of justice, choose the method that results in the east expense and greatest convenience for all parties involved in the case.

In this case, fifty-eight witnesses from the Spartanburg area were noticed to testify at trial. We hold the record supports the trial judge's finding that transferring a jury was the least expensive and most convenient alternative to afford appellant a fair and impartial jury.

■ Appellant complains the trial judge improperly limited his voir dire of venireman Billy Poore, a retired highway patrolman. Appellant attempted to ask him whether he would "tend to give more credibility to the testimony of a police officer than you would to the defendant or a civilian witness?" Appellant also claims he would have asked the same question of venireman Keith Pruett who was the son of a retired highway patrolman.

■ Neither Mr. Poore nor Mr. Pruett was seated on the jury since appellant exercised two of his peremptory strikes to remove them.[2] In reviewing a challenge to juror qualification, we focus on those jurors who are seated to determine whether a defendant received a fair trial. *State v. Green,* 301 S.C. 347, 392 S.E. (2d) 157 (1990). Here, appellant has failed to demonstrated any prejudice since the two venire-

---

[2] Appellant exercised only seven of the ten strikes permitted him under S.C. Code Ann. § 14-7-1110 (Supp. 1992).

men he would have questioned were not seated. Moreover, there is no error in disallowing questions regarding the weight a juror would give one witness over another. *State v. Davis*, — S.C. —, 422 S.E. (2d) 133 (1992).

Appellant contends potential juror Linda Hall was erroneously disqualified because of her reluctance to vote for a death sentence.

In a capital case, a juror may not be excluded for his or her attitude against capital punishment unless it would render that juror unable to return a verdict according to law. S.C. Code Ann. § 16-3-20(E) (Supp. 1992). The standard is whether the juror's views would prevent or substantially impair the performance of his or her duties as a juror. *State v. Green, supra.* The determination whether a juror is qualified or disqualified to serve in a capital case is within the discretion of the trial judge and will not be reversed on appeal unless wholly unsupported by the evidence. *Id.; State v. Plemmons*, 286 S.C. 78, 332 S.E. (2d) 765 (1985). Further, in reviewing the trial judge's qualification or disqualification of prospective jurors, the responses of a challenged juror must be examined in light of the entire voir dire. *State v. Green, supra; State v. Spann*, 279 S.C. 399, 308 S.E. (2d) 518 (1983).

Here, Ms. Hall stated because she had a son appellant's age (twenty-two), she would find it "very difficult" to impose the death penalty on a young person. She stated she could not vote for death in this case and responded to defense counsel's further questioning as follows:

A. No, I'm telling you that I would have a difficult time imposing the death penalty on young men, young woman in that age range.
Q. Uh-huh. (Affirmative) Could, could you—
A. Okay.
Q. —do it if you were convinced that as the judge gave you the law and as you heard the evidence, it was the appropriate thing to do, and you agreed with the other jurors on the case?
A. You've asked me that question about four times now—
Q. Yes, ma'am.
A. —in a different way. And the answer is still no.

Q. Okay. You can't do it? Is that what you're telling me?
A. No.

We find the record supports the disqualification of Ms. Hall on the ground her views would substantially impair her performance as a juror since, contrary to her views, age is not a bar to capital punishment in this case. Because Ms. Hall could not consider imposition of a penalty allowed by law, she was properly excused.

Appellant contends veniremen Steve Penland and Kay Johnson were improperly disqualified because of their reluctance to impose a death sentence on a non-triggerman.

Ms. Johnson stated she could not vote for death no matter what the degree of the defendant's involvement. Mr. Penland stated during the course of questioning that he "probably could" consider it but then finally responded:

THE COURT: If the facts were bad enough, could you give a non-triggerman the penalty of death?

MR. PENLAND: I don't, I don't know. It's hard to say. I mean it would have to be a, a lot of, a lot of evidence I guess to make me believe it.

THE COURT: Well, of course, it would. But if it were a lot of evidence, could you give a non-trigger man a sentence of death?

MR. PENLAND: Well, really, I don't really think I could and live with it you know.

THE COURT: Yeah, no matter how much involvement he had, you couldn't do it?

MR. PENLAND: I don't think so.

We find the record of the voir dire as a whole supports the trial judge's ruling these jurors were disqualified because their views would substantially impair their performance as jurors. Major participation in the crimes committed combined with reckless indifference to human life is sufficient culpability to impose the death penalty upon a defendant liable for murder under a theory of accomplice liability. *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed. (2d) 127 (1987). Since neither juror could consider imposition of a death sentence allowed by law, they were properly excused.

## GUILT PHASE ISSUES

The murders in this case occurred on the night of January 7, 1991. An off-duty employee, David Hopkins, returned to the Westgate Mall Cinema and found no employees present although films were still being shown. The body of nineteen-year-old Alex Hopps was discovered behind the theatre outside an exit door. He had been shot at close range in the left temple.

When Hopkins arrived at the theatre he had seen and recognized appellant's co-defendant, David Rocheville, rummaging through James Greene's car in the parking lot.[3] Greene was the other employee on duty with Alex Hopps and he was missing from the theatre. Police arrested Rocheville at 5:00 a.m. the next morning. A few hours later, Rocheville led police to the body of James Greene which was found in a shallow ditch on the side of a rural road several miles from the cinema. Appellant was arrested later that day.

Appellant consented to be interviewed by police officers after waiving his rights. At the end of the interview, Chief Murray prepared the following statement from his notes:

> [Longworth] stated that on January 7, 1991, he left his home at approximately four o'clock p.m. in route to meet his friend, David Rocheville, at a television repair shop where Rocheville worked. After meeting him, they both traveled to Rocheville's home in Duncan, South Carolina where Rocheville cleaned up. They left there in Longworth's mini van that is actually owned by his father in route to the Continental Cafe located in the Hillcrest Mall in Spartanburg.
>
> They arrived there at approximately 7:30 p.m. where he, Longworth, drank approximately six beers and three kamikazes. While there, they spoke to a bartender by the name of Larry, last name unknown, who works there and knows them. After leaving the cafe, he and Rocheville drove around town in the mini van for a short time, and eventually stopped at an unknown place between Hillcrest and West Gate where they purchased a twelve pack of beer. They continued driving around all the while

---

[3] Both appellant and Rocheville were former employees of the theater owner.

drinking beer, and decided to rob the West Gate Cinema.

They arrived at the West Gate Theater at an unknown time. But he knows it was before twelve o'clock midnight. Upon entering the theatre, Longworth remembered seeing James Greene, an employee, and, in fact, waved to him. Longworth and Rocheville walked around inside the theatre for a short time, and believed the two of them went inside where the movie Dances with Wolves was playing. Longworth remembers that when they entered the theater through the front door, there was no one in the ticket booth. And accordingly, they walked in without having to pay.

After being seated in the theater for a short time, they decided it was time to rob the place. As they walked out toward the lobby of the theater, Longworth saw the usher, Alex Hopps, standing near the end of a counter. He went over to him, and they started walking down a hallway talking. His plan was to take the usher outside and knock him unconscious.

As they walked down the hallway, he knocked the usher to the floor by sweeping his feet out from under him. He then immediately jumped on him, and placed his hands over the usher's mouth. Rocheville, who had been given the gun that Longworth had carried into the theater in a shoulder holster hidden under his coat, was watching the activity. As Longworth and the usher walked outside using a side exit near where he and Rocheville had been seated in the theater, they were followed by Rocheville.

Once outside, Longworth stated that he grabbed the usher by the right arm and twisted it up behind his back. He then forced the usher to lean over a waist high bar that was in place to, to protect the building or a cooling unit, and then took his left hand pushing the usher or pinning him on the bar. Rocheville then shot the usher in the left side of the head while Longworth was holding him. The weapon used and the one which Longworth earlier had given him is [a] .44 magnum Ruger, and it was loaded with semi wad cutters.

After the shooting, Rocheville returned the weapon to Longworth, and he placed it in the aforementioned shoul-

der holster. Longworth stated that he did not know the usher although it was pointed out to him that the usher had at one time worked for him at the Converse Theaters when Longworth was an assistant manager. After the shooting, Longworth advised that he and Rocheville walked around to the front of the theater to proceed with the robbery. However, when they arrived at the front, the doors were locked.

Longworth stated that he again saw James Greene, and motioned to him to open the doors. Greene complied. Once inside, Longworth stated that he drew this same gun on Greene, and stated something to the effect that he was sorry. But he was going to rob the theater. And requested that Greene open the safe. Greene, upon seeing the gun, became so nervous that it took him three tries to successfully open the safe.

Longworth took several money bags from the safe, and then asked Greene if he had made the deposits. Greene responded yes, and Longworth stated don't lie to me. Greene stated that the deposits were in his personal car. The three of them, Longworth, Greene, and Rocheville then walked to Greene's vehicle parked at the side of the cinema, obtained the remaining money bags, and gave them all to Rocheville. They then all got into the aforementioned mini van, which was parked next to Greene's vehicle. Longworth was driving. Rocheville was in the back. And Greene was seated in the passenger side.

Longworth stated that he then gave the .44 magnum Ruger to Rocheville, and stated if he moves shoot him referring to Greene. The three of them then proceed to drive up highway number 176 toward Inman, and then turned right off number 176 onto an unknown road. They drove a short distance and stopped the van. Longworth then told Greene to get out of the van, walk five paces, get down on your knees, and stare straight ahead.

He did as instructed. And at this point, Rocheville got partially out of the van perhaps with one foot on the ground and the other in the van, and shot Greene in the back of the head. Green then rolled over into the ditch near where he and been kneeling.

* * * * *

[Longworth] did mention that he initially told James Greene that he would not hurt him, and that he was going to let him out in a field unharmed. He stated that Greene apparently did not believe him as he pleaded for them not to hurt him, and assured them that he would not identify them. He just wanted to live so that he could see his girlfriend.

At one point during the interview, Longworth slammed his fist on the table, and exclaimed my god we killed those kids for fifteen hundred dollars.

When asked to sign this statement, appellant declined saying he wanted an attorney to read it first. The statement was admitted at trial during Chief Murray's testimony. The Solicitor then asked Murray if he recalled anything else not included in the statement and Murray responded:

A. Yes, sir, I do recall at one point during the interview he said that something to the effect that no one was supposed to be killed or was not intended that anyone get killed.

Q. Uh-huh. (Affirmative)

A. And, and one other thing that, that he had mentioned was that when he had taken Alex outside and put him over the bar, he observed Rocheville raising the gun up to Alex's head, and he did nothing to stop him. He just watched him.

Q. Who did nothing to stop him?

A. Longworth did nothing to stop him.

Q. Did he say he knew what was happening?

A. *He said he knew what was going to happen.*

Q. All right, sir

A. But he did nothing to stop him.

Appellant objected and the trial judge sent the jury out. Appellant then complained he had never received notice of any statement to the effect that he knew what was going to happen before Rocheville killed Alex Hopps. The trial judge questioned Chief Murray himself and determined that such a statement was not included in Murray's notes. The trial judge then called the jury back and gave the following instruction:

THE COURT: Now Mr. Foreman, and ladies and gentlemen, the, during the testimony that was being presented, the defense counsel objected properly. You had heard testimony from the statement by Chief Murray that the defendant says I saw Rocheville with the gun, and I did nothing to stop it. That's part of the statement. The solicitor went on to say did Longworth say I knew what, he knew what was going to happen. And Chief Murray says yes, he says he knew what was going to happen. And that's not true. And that's not in the statement.

And I have conferred with Chief Murray here in this courtroom on the record. And that is his interpretation. That is not a statement by the defendant. I must ask you to disregard that, to wipe that comment from your mind. It is improper thing to be injected into this trial, and you disregard it entirely please. It is so important.

The only statement made was I saw Rocheville, and I did nothing to stop him. And that's the end of it as best I can tell. Disregard anything further from Chief Murray on that point as I have outlined to you. All right. Thank you.

Appellant claims the trial judge erred in denying his motion for a mistrial because the Solicitor knowingly attempted to use false testimony and the curative instruction was not sufficient to cure the prejudice.

We find the record of the trial judge's colloquy with the Solicitor indicates the Solicitor did not know Chief Murray was going to testify as he did. Further, the curative instruction was clearly sufficient to ensure the jury did not attribute Chief Murray's statement to appellant. Appellant complains, however, he was prejudiced because the trial judge told the jury it was Chief Murray's "interpretation" of what appellant had said, thereby giving the statement "the imprimatur of credibility."

An instruction to disregard incompetent evidence is usually deemed to cure any error in its admission. *State v. Dawkins*, 297 S.C. 386, 377 S.E. (2d) 298 (1989). Here, the trial judge emphatically told the jury to totally disregard the challenged testimony. Even if the jury could have inferred from the trial judge's instruction that Chief Murray's

"interpretation" was valid, we find no prejudice. Under a theory of accomplice liability, it is immaterial whether appellant knew beforehand that Rocheville was going to shoot Hopps. *See, State v. Bell,* 305 S.C. 11, 406 S.E. (2d) 165 (1991) (accomplice liability applies to murder which is natural and probable consequence of armed robber). Nor is such knowledge material to imposition of the death penalty under the law set forth in *Tison v. Arizona, supra.* Accordingly, we find no error.

Appellant contends the trial judge erred in failing to include the element of intent in his charge on kidnapping. Appellant made no request nor objected to the charge given and this issue is therefore not properly before us. In any event, the trial judge did state that to constitute kidnapping a carrying away must be "with a *purpose* to violate the law." *See State v. Ferguson,* 302 S.C. 269, 395 S.E. (2d) 182 (1990) (equating "purpose" and "intent").

Appellant contends the trial judge's charge on reasonable doubt in both phases of the trial did not comply with this Court's decision in *State v. Manning,* 305 S.C. 413, 409 S.E. (2d) 372 (1991). The charge given in this case suffers none of the infirmities found in *Manning* to improperly allow a lessened degree of proof. *See also, State v. Baker,* — S.C. —, 424 S.E. (2d) 492 (1992) (reversible error to charge reasonable doubt as "strong uncertainty"). Nor did we mandate in *Manning* that a specific charge be given. Accordingly, we find no error here.

### SENTENCING PHASE ISSUES

Appellant contends the trial judge erred in refusing his request that the jury be charged not to speculate whether the sentence imposed would deter others. We recently held in *State v. Simmons,* ___ S.C. ___, 427 S.E. (2d) 175 (1993), that the propriety of this charge need not be considered where the State does not argue deterrence. Here the Solicitor did not mention general deterrence. We find no error in the refusal of appellant's requested charge.

Further, appellant contends the trial judge improperly limited his closing argument regarding general deterrence. Counsel argued:

> It's been said that the death penalty is a deterrent. I ask you whether or not if life imprisonment is not a deterrent to this crime or to other crimes? How would the death penalty—

At this point, the Solicitor objected. The trial judge then ruled:

> Yes, sir, deterrence would not be an issue in this case. But . . . whether this defendant in this crime is deserving of which penalty authorized by our law.

Appellant claims disallowing his argument regarding general deterrence is error under "principles of fundamental fairness" in view of our previous decisions allowing the Solicitor to argue general deterrence. *See State v. Truesdale*, 301 S.C. 546, 393 S.E. (2d) 168 (1990); *State v. Jones*, 298 S.C. 118, 378 S.E. (2d) 594 (1989); *State v. Yates*, 280 S.C. 29, 310 S.E. (2d) 805 (1982).

While we decline to reconsider at this time the propriety of allowing argument regarding general deterrence, we hold the restriction of appellant's argument in this case resulted in no fundamental unfairness since the trial judge permitted neither the Solicitor nor appellant to argue it. We find no reversible error.

### CONCLUSION

Appellant's remaining exceptions are affirmed pursuant to Rule 220(b)(1), SCACR. Issue 6: *State v. Davis*, ___ S.C. ___, 422 S.E. (2d) 133 (1992); Issue 9: *State v. Rocheville*, ___ S.C. ___, 425 S.E. (2d) 32 (1993); Issue 10: *State v. Rocheville*, *supra*; Issue 11: *State v. Davis, supra*; Issue 12: *State v. Green*, 301 S.C. 347, 392 S.E. (2d) 157 (1990).

We have conducted the madatory review provided in S.C. Code Ann. § 16-3-25 (1985) and conclude the sentence is not arbitrary, successive, or disproportionate and the evidence supports the finding of aggravating circumstances.

Affirmed.

HARWELL, C.J., and CHANDLER and TOAL, J.J., concur.

FINNEY, J., dissents in separate opinion.

FINNEY, Justice, dissenting:

For the reasons set forth in my dissenting opinion in *State v. Rocheville,* — S.C. —, 425 S.E. (2d) 32 (1993), I would remand for a new sentencing proceeding.