PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

RICHARD LONGWORTH,
            *Petitioner-Appellant,*

v.

JON E. OZMINT, Commissioner,
South Carolina Department of
Corrections; HENRY MCMASTER,
Attorney General, State of South
Carolina,

            *Respondents-Appellees.*

No. 04-4

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Sol Blatt, Jr., Senior District Judge.
(CA-02-744-3-08BC)

Argued: June 3, 2004

Decided: July 28, 2004

Before NIEMEYER, MICHAEL, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Michael and Judge Gregory joined.

## COUNSEL

**ARGUED:** David Grant Belser, BELSER & PARKE, Asheville, North Carolina, for Appellant. Donald John Zelenka, Chief Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF

SOUTH CAROLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Tanya L. Davis, Blue Hill, Maine, for Appellant. Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees.

## OPINION

NIEMEYER, Circuit Judge:

In 1991, Richard Longworth was convicted in a South Carolina state court for the murders of Alex Hopps and James Greene, employees of a Spartanburg, South Carolina movie theater that Longworth and an associate robbed. Longworth was sentenced to death. Following direct appeals and petitions for post-conviction relief in state courts, Longworth filed this petition in the district court for a writ of habeas corpus, under 28 U.S.C. § 2254, raising 19 grounds in support of his petition. The district court denied Longworth's petition but granted a certificate of appealability with respect to ground 4 (that the State presented "knowingly false" testimony of a deputy sheriff), ground 11 (that one of Longworth's attorneys had an actual conflict of interest), ground 15 (that the State failed to disclose to Longworth exculpatory evidence of a deputy sheriff who believed that before trial Longworth had expressed remorse), and ground 19 (that Longworth was, for numerous reasons, deprived of the effective assistance of counsel).

We affirm. We conclude, with respect to grounds 4, 11, and 15, that the state court's post-conviction relief decision rejecting these claims was neither contrary to clearly established federal law, as determined by the U.S. Supreme Court, nor involved an unreasonable application of that law, and that the state court's decision did not involve an unreasonable determination of the facts before it. And with respect to ground 19, we conclude that it was procedurally defaulted.

I

In the evening of January 7, 1991, Longworth and his friend David Rocheville decided, while driving around in their minivan, to rob the

WestGate Mall Cinema in Spartanburg, South Carolina. After entering the theater, Longworth took his handgun from his shoulder holster and gave it to Rocheville, and the two viewed a movie for a short time. The two then proceeded into the lobby to implement their plan to rob the theater of money located in the ticket booth. When they encountered an usher, Alex Hopps, walking down the hallway, Longworth knocked Hopps down, jumped on him, held his hand over Hopps' mouth, and dragged him outside of the theater through the side exit. As Longworth pinned Hopps against a waist-high bar that protected the air conditioning unit, Rocheville shot Hopps in the left side of the head. Rocheville then returned the gun to Longworth, who placed it back in his shoulder holster.

To reenter the theater, Longworth and Rocheville walked around to the front of the cinema and found the front doors locked. They motioned to James Greene, a cinema employee to whom they had waved when they initially entered the theater, and Greene opened the door. At that point, Longworth drew his gun and demanded that Greene open the safe in the ticket booth. Longworth took several money bags from the safe and ascertained from Greene that there were more bags in Greene's automobile, ready for deposit. After retrieving those bags, Longworth and Rocheville forced Greene into their minivan, which Longworth drove. Longworth again handed his gun to Rocheville and instructed him to shoot Greene if he moved. After driving away from the theater, Longworth stopped the vehicle and instructed Greene to get out, walk five paces, get on his knees, and stare straight ahead. At that point, Rocheville shot Greene in the back of the head.

Longworth and Rocheville were arrested the next day, after Rocheville had led law enforcement officers to Greene's body. After Longworth was arrested, he provided officers with a detailed statement of the crimes that he and Rocheville had committed. Each was indicted on two counts of murder, one count of kidnapping, and one count of armed robbery. Separate juries convicted them and sentenced them to death. The South Carolina Supreme Court affirmed the convictions and sentences on direct appeal. *State v. Longworth*, 438 S.E.2d 219 (S.C. 1993); *State v. Rocheville*, 425 S.E.2d 32 (S.C. 1993). Longworth's petition to the U.S. Supreme Court was denied. *Longworth v. South Carolina*, 513 U.S. 831 (1994).

In December 1994, Longworth filed an application for post-conviction relief in the Spartanburg County Court of Common Pleas, ultimately raising more than 30 grounds for relief. The state post-conviction court ("State PCR Court") permitted discovery and held a lengthy evidentiary hearing, after which it requested supplemental briefing from both parties and directed the State to submit a proposed order. The State PCR Court denied all of Longworth's claims for relief and substantially adopted the State's proposed 132-page order. *Longworth v. Evatt*, C.A. No. 95-CP-42 0014 (S.C. Ct. C. P. Aug. 3, 2000). The South Carolina Supreme Court denied Longworth's petition for review, and the U.S. Supreme Court denied Longworth's petition for a writ of certiorari. *Longworth v. South Carolina*, 536 U.S. 928 (2002).

Longworth then filed the petition in this case, raising 19 grounds for relief. On 15 of the grounds, Longworth did not object to the magistrate judge's recommendations to deny the claims, and, as a result, the district court adopted the magistrate judge's recommendations and denied the claims. *Longworth v. Ozmint*, 302 F. Supp. 2d 535, 542 (D.S.C. 2003). On the remaining four grounds (grounds 4, 11, 15, and 19), the court held that ground 19 (Longworth's general claim for ineffective assistance of counsel) was procedurally defaulted and that the remaining three grounds lacked merit. *Id.* at 542-69. With respect to all four grounds, the district court granted a certificate of appealability pursuant to 28 U.S.C. § 2253(c). *Longworth v. Ozmint*, 302 F. Supp. 2d 569, 575 (D.S.C. 2004). This appeal followed.

II

In his most substantial argument (ground 11), Longworth contends that he was denied his Sixth Amendment guarantee of effective assistance of counsel because his attorney Hubert Powell represented both Longworth and Longworth's parents and therefore labored under an actual conflict of interest that adversely affected his representation. Longworth contends:

> The conflict was manifested by: 1) Powell's failure to disclose to co-counsel, defense experts or the jury mitigation evidence concerning family alcoholism and turmoil, which would have adversely affected his clients, petitioner's par-

ents, but would have benefitted petitioner, and [Powell's failure to] develop mitigation evidence, 2) Powell's duty to protect the parents' income stream for their benefit and his own benefit, by concealing evidence of [Longworth's] parents['] alcoholism and marital discord[,] which would have cost the parents their jobs, 3) Powell's duty to protect the parents as material witnesses and/or as suspects, and 4) all other relevant facts . . . .

Following Longworth's arrest, his parents hired Powell to represent Longworth in his capital murder trial, agreeing to pay Powell $12,000 in attorneys fees. On Powell's request for additional resources with which to represent Longworth, the state trial court appointed private attorney Andrew J. Johnston and the Spartanburg County Public Defender Office as additional counsel to "represent Richard W. Longworth . . . *along with* Hubert H. Powell, Jr. of the Spartanburg County Bar who[ ] has been retained by the parents of Richard W. Longworth." (Emphasis added). Three days later, however, the same trial court amended its order on the initiation of the Public Defender Office to "clarify" that "Hubert H. Powell, Jr. of the Spartanburg County Bar has the position of attorney for the parents of the Defendant, Richard W. Longworth." This clarification was initiated without any request by Longworth, his parents, or Powell and without their knowledge. The apparent purpose of seeking the revised order was to make Longworth eligible for public funds to support his defense. According to Powell, he only learned of the amended order shortly before trial. He nevertheless continued to participate as a member of the defense team for Longworth and continued to prepare for trial, acting as a liaison with Longworth's family and doing substantial work on the development of mitigation evidence for the sentencing phase of the trial.

At the State PCR hearing, Longworth's mother testified that she had told Powell about alcohol abuse and domestic violence within the family and that she did not want such evidence to come out during sentencing "unless it was absolutely necessary," for fear that her foster children would be taken away and Longworth's father might lose his job. Longworth accordingly contended in the State PCR Court that the mitigation evidence was incomplete and inadequate. He pointed specifically to the testimony of Dr. David Raskin, a forensic psychia-

trist, who explained in a deposition that his evaluation did not include certain information about domestic problems between Longworth's parents and that he had assumed that Longworth had grown up in "a stable, caring environment." According to Raskin, information about alcohol abuse and violence "would have changed dramatically the way [he] did [his] interview" of Longworth and that he would have presented the new information about family environment to the jury.

As revealed during the PCR hearing, however, it turned out that it was co-counsel Andrew Johnston who provided Dr. Raskin with the relevant social history report on which Raskin relied. Johnston testified that he was aware of Longworth's social history and that if he failed to provide it to Dr. Raskin, it was an oversight. Even though the social history report included little detail about drinking or marital problems in Longworth's household — Johnston conceded that he did not believe that the social worker did "that great of [a] job" in preparing the report — Mrs. Longworth testified that she did tell the social worker about the marital problems and excessive drinking. It was also Johnston, not Powell, who told Raskin that Longworth "came from a middle class background, that his family [members] were nice people, that they may have had some problems with alcohol abuse at times and there may have been a bit of marital discord in the house at times, but [that] the family history [was] unremarkable as far as explaining what happened later." And it was Johnston who led the development of Longworth's mitigation defense strategy. He testified at the State PCR hearing that he did not think that Longworth's family history was a key point to the case. Johnston explained that he made a strategic decision to focus the defense on (1) Longworth's history of substance abuse and intoxication at the time of the murders, and (2) Longworth's lesser role and Rocheville's influence over Longworth.

Following the State PCR hearing, the State PCR Court found that Longworth's parents hired Powell *to represent Longworth* and entered into a contract for that purpose. The court found that after he was retained, Powell contacted other lawyers for advice in handling capital cases and for the purpose of putting together a defense team. The court also found that after Powell spoke with Andrew Johnston and members of the Public Defender Office, he prepared a petition for a declaration of indigency and appointment of counsel and presented it to the trial court. Accordingly, the trial court appointed Andrew

Johnston and the Public Defender Office to represent Longworth, "along with" Powell. The State PCR Court found that subsequently, without Powell's apparent knowledge, Charles E. Sanders, a deputy Public Defender, prepared an amended order that included the statement that Powell "has the position of attorney for parents of the Defendant." The State PCR Court found, however, that Powell did not know of Sanders' initiative or the revised order and that when he did learn of it, it did not affect his representation of Longworth. The court noted that Powell considered Richard Longworth "his 'true client'" and that he continued to represent Longworth, meeting with him 44 separate times and "probably more." The court concluded, "It is undisputed that Powell considered his actual client to be [Longworth], and his interests were solely directed to saving his life." With respect to any potential differences of opinion on Powell's performance, the State PCR Court found "attorney Powell's testimony persuasive that he did not prevent any pertinent information of family background from being provided the defense-retained social worker, Dorothy Harmon, in order for her to complete a social history of [Longworth]." The State PCR Court concluded:

> [T]here was no actual conflict interest in attorney Powell's role in the defense of Richard Longworth. Further, Powell's role in the representation of [Longworth] did not adversely affect the representation by attorneys Johnston or Dillard. Powell's role and interests did not diverge with respect to a material fact or legal issue or course of action on [Longworth's] behalf. There is no credible evidence which tends to establish that any of [Longworth's] defense counsel engaged in any course of conduct which was designed to protect the Longworth family to the detriment of [Longworth's] interest. The evidence is persuasive that at all times attorney Powell considered the applicant his only client and his only obligation to [Longworth's] parents was to present the best defense possible for their son.

Based on the State PCR Court record, the district court concluded that there was no actual conflict of interest and that, although there was conflicting evidence as to whether family information was prevented from being disclosed, the State PCR Court's credibility determinations should not be disturbed.

We review the district court's decision *de novo*, applying the same standard that the district court was required to apply. *See Hunt v. Lee*, 291 F.3d 284, 289 (4th Cir. 2002). Under 28 U.S.C. § 2254(d), a federal court must deny a state prisoner's habeas application unless the state court's adjudication of a claim "resulted in a decision" that was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "based on an unreasonable determination of the facts" before the state court.[1]

A defendant can prove a Sixth Amendment violation based on counsel's conflict of interest by "demonstrat[ing] that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *see also Mickens v. Taylor*, 535 U.S. 162, 171 (2002); *Strickland v. Washington*, 466 U.S. 668, 692 (1984). To prove an actual conflict of interest, a defendant "must show that [his] interests diverge[d] with respect to a material factual or legal issue or to a course of action." *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir. 1998) (*en banc*) (internal quotation marks and citation omitted); *see also United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991) (stating that an actual conflict adversely affecting representation can include an attorney's action taken on behalf of one client that is necessarily adverse to the defense of another or an attorney's failure to take action on behalf of one because it would adversely affect the other).

Longworth relies heavily on the revised order entered by the state trial court that indicated that Powell had "the position of attorney for the parents of the Defendant." But he provides no explanation for the revised order other than what the record shows, i.e., that an attorney in the Public Defender Office, on his own initiative, sought the revision in order to make Longworth eligible for public funds to support his defense, even though there was no change in circumstances, and neither Powell nor Longworth nor his parents knew of the revised order when made. Indeed, according to the evidence credited by the

---

[1] Although we have indicated that we "do not applaud" a state court's practice of substantially adopting the prosecution's proposed memorandum and order, the state court's decision still merits the deferential review required by § 2254(d). *Bell v. Ozmint*, 332 F.3d 229, 233 (4th Cir. 2003).

State PCR Court, Powell always thought of himself as a member of Longworth's defense team solely dedicated to the defense of Longworth, and he continued to work on Longworth's defense. The State PCR Court pointed out that the parents had no interest that needed representation; they were not charged and were not otherwise in need of counsel. The only explanation in the record for the language used by the state court in its revised order appointing counsel was to create a legal fiction to protect financing for Longworth's defense team, which included Powell. In view of this record, we conclude that the State PCR Court's conclusion finding no conflict of interest was not an unreasonable determination of the facts.

Additionally, even if, contrary to the findings of the State PCR Court, Longworth's view of the record were to be accepted, he still was not able to demonstrate how anything that Powell did on his behalf compromised his interest or prejudiced his representation. While Longworth points to the testimony of Dr. Raskin as evidence of Powell's reluctance to bring forth mitigating factors, it was in fact Powell's co-counsel Andrew Johnston who worked with Dr. Raskin and took responsibility for whatever was given or withheld from Dr. Raskin. In addition, Johnston acknowledged that he knew the information but concluded, as a defense strategy, that Longworth's family history was not a key point in Longworth's defense. Rather, Johnston wanted to focus on Longworth's personal history of substance abuse and intoxication at the time of the murders and his purportedly lesser role in the criminal conduct. Thus, on the issue of prejudice, the State PCR Court's conclusion that any conflict did not adversely affect Longworth's representation was not an unreasonable determination of the facts.

III

Longworth also contends that the state trial court denied him due process in refusing to declare a mistrial after the State introduced "knowingly false or misleading testimony" from Spartanburg County Chief Deputy Sheriff James Murray, who testified that Longworth had told interrogating officers that he knew what was going to happen before Rocheville shot Alex Hopps and did nothing to stop him. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally

unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury" (footnotes omitted)); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Knowingly false testimony of a law enforcement officer is imputable to the prosecution, *see Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998), and Longworth contends that in this case such testimony was material because the State had the burden of proving that even though Longworth was not the triggerman, he intended to kill Hopps or had a reckless disregard for human life. *See Tison v. Arizona*, 481 U.S. 137, 157-58 (1987). Accordingly, Longworth argues that a new trial is required to satisfy due process. *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972).

Deputy Murray, who participated in the post-arrest interrogation of Longworth, took notes of the interrogation and prepared a statement for Longworth to sign. Even though Longworth refused to sign the statement, opting to have the advice of an attorney, Deputy Murray read the statement during trial as an accurate representation of what Longworth had said. After completing presentation of the statement, the State asked Deputy Murray whether he recalled any other remarks by Longworth that were not included in the statement. Deputy Murray replied that Longworth "had mentioned . . . that when he had taken Alex [Hopps] outside and put him over the bar, he observed Rocheville raising the gun up to Alex's head, and he did nothing to stop him. He just watched him." The State then asked, "Did [Longworth] say he knew what was happening?" Murray replied, Longworth "said *he knew what was going to happen*. . . . But he did nothing to stop him." At that point, Longworth's counsel objected because the defense had never been made aware that Longworth had stated that he *knew what was going to happen* and such a statement was potentially important.

Following the objection, the court questioned Deputy Murray outside of the jury's presence, and Deputy Murray told the court that the alleged statement was a paraphrase, not a "quote *per se*." The court asked Deputy Murray directly, "Did [Longworth] say I knew what was gonna happen or is that your interpretation of the statement?" Deputy Murray responded, "I think that from what he said that was my interpretation of what he meant." The court emphasized the important difference between a statement that Longworth saw

Rocheville point the gun yet did nothing to stop him and a statement that he *knew what was going to happen*, and the court determined from Deputy Murray that the latter statement was not reflected in the deputy's notes. Accordingly, after recalling the jury, the court gave the following curative instruction to the jury:

> You had heard testimony from the statement by Chief Murray that the defendant says I saw Rocheville with the gun, and I did nothing to stop it. That's part of the statement. The solicitor went on to say did Longworth say I knew what, he knew what was going to happen. And Chief Murray says yes, he says he knew what was going to happen. And that's not true. And that's not in the statement.

> And I have conferred with Chief Murray here in this courtroom on the record. And that is his interpretation. That is not a statement by the defendant. I must ask you to disregard that, to wipe that comment from your mind. It is [an] improper thing to be injected into this trial, and you disregard it entirely please. It is so important.

> The only statement made was I saw Rocheville, and I did nothing to stop him. And that's the end of it as best as I can tell. Disregard anything further from Chief Murray on that point as I have outlined to you.

On direct appeal, the South Carolina Supreme Court held that the trial court's "curative instruction was clearly sufficient to ensure the jury did not attribute Chief Murray's statement to [Longworth]." *Longworth*, 438 S.E.2d at 225.

During the State PCR hearing, the state solicitor testified that he had met with Deputy Murray and another witness about one week before trial. At that time, Deputy Murray told him that Longworth said "something like" he knew or intended that the killings would take place. According to the solicitor, because such a statement was not recorded in Deputy Murray's notes, the solicitor told Deputy Murray that it was not sufficiently reliable and would not be used at trial. The solicitor testified that he was surprised at trial when Deputy Murray testified that Longworth said he knew what was going to happen. The

State PCR Court concluded that Deputy Murray's testimony at trial was not false, finding that his statement revealed his "honest, but vague, recollection that Longworth indicated to him during the interrogation that he knew what was going to happen, but was unable to recall the precise words used." The State PCR Court also concluded that the state trial court's curative instruction cured any prejudice that may have resulted from Deputy Murray's statement.

We agree with the district court's rejection of Longworth's contention that habeas relief is warranted on this ground. The State PCR Court acted reasonably in concluding from the facts before it that Deputy Murray's statement was not false. Longworth incorrectly insists that the state trial court explicitly found that the statement was *knowingly false*. The trial court in fact found that Longworth did not make the alleged statement but that it was Deputy Murray's "interpretation" of Longworth's statement. As the district court observed, "There is a clear distinction between (1) knowing a statement was not made but testifying that it was made, and (2) honestly believing that the statement was implicit in the words spoken but, because it was based on interpretation, the statement is inadmissible." *Longworth*, 302 F. Supp. 2d at 557. At trial, when questioned by the state trial court, Deputy Murray stated that, although "not verbatim" and not "a quote *per se*," the statement he attributed to Longworth was Deputy Murray's interpretation of Longworth's words. At the State PCR hearing, Deputy Murray testified repeatedly that his response at trial was a true statement, that it was what he thought Longworth meant (e.g., "What I was saying there was that I couldn't recall exactly what was being said [by Longworth, but that] [w]hatever he said, that's what I thought he meant"). The State PCR Court credited Deputy Murray's testimony on this matter, and we conclude that that was not an unreasonable determination of the facts.

In addition, to protect any potential prejudice, the state trial court gave a forceful curative instruction that instructed the jury not to consider the statement and told them that "that's not in the statement" attributable to Longworth. "The only statement made [by Longworth] was I saw Rocheville, and I did nothing to stop him." The trial court also emphasized to the jurors that it was "so important" that they disregard the challenged testimony and that it was not Longworth's statement but Deputy Murray's interpretation. Reviewing this on

appeal, the South Carolina Supreme Court concluded that "the curative instruction was clearly sufficient to ensure the jury did not attribute Chief Murray's statement to [Longworth]." *Longworth*, 438 S.E.2d at 225. And we conclude that the South Carolina Supreme Court's determination was not an unreasonable one.

IV

Longworth next contends that the State violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose Deputy Murray's mental impression that Longworth expressed remorse during his post-arrest interview. Specifically, Deputy Murray testified at trial that Longworth slammed his fist on the table during the interrogation and exclaimed, "[M]y god, we killed those kids for fifteen hundred dollars." When cross-examined, Deputy Murray testified that he did not know if Longworth's statement was one of remorse. Later, however, during his deposition for the State PCR proceeding, Deputy Murray testified that he thought Longworth was remorseful, based on Longworth's action and statement, but that Longworth "may've just been mad that he got caught." Longworth contends that Deputy Murray's statement of his mental impression about Longworth's remorse qualified as *Brady* material that the prosecution was required to provide to him for use at trial.

We conclude that this argument lacks any merit. Although Longworth relies on *Strickler v. Greene*, 527 U.S. 263, 282 (1999) (referring to notes and letters recounting a witness' impression of an episode as "trivial," in contrast to her subsequent testimony that the episode was "terrifying"), to support the proposition that *Brady* applies to a witness' mental impressions, the undisclosed impressions in *Strickler* were contained in written *documents*. Here, Longworth's *statement* was disclosed to the defense, and not only was Deputy Murray's perception of the statement unrecorded, his perception was tentative (i.e., Longworth "may've just been mad that he got caught"). There is certainly no "clearly established Federal law, as determined by the Supreme Court of the United States," that requires the State to disclose such mental impressions as *Brady* material. *See* 28 U.S.C. § 2254(d).

V

Finally, Longworth contends that he was deprived of the effective assistance of counsel at trial for numerous reasons in addition to the conflict of interest discussed in Part II, including: the failure to disclose Longworth's alleged cocaine use at the time of the murders; the failure to further investigate Longworth's background; the failure to provide to an expert witness evidence of Longworth's cocaine use and his family history; the presentation of two witnesses who offered some allegedly damaging testimony; and counsels' alleged incompetence and inexperience. While we would find no merit in any of these contentions, we conclude that they are procedurally defaulted as a result of Longworth's failure to raise them in his petition for certiorari to the South Carolina Supreme Court for review of the State PCR Court's decision.

A habeas petitioner in state custody generally must exhaust state court remedies, *see* 28 U.S.C. § 2254(b), and a federal habeas court may not review unexhausted claims that would be treated as procedurally barred by state courts — absent cause and prejudice or a fundamental miscarriage of justice. *See Clagett v. Angelone*, 209 F.3d 370, 378 (4th Cir. 2000); *Mackall v. Angelone*, 131 F.3d 442, 445 (4th Cir. 1997) (en banc). This exhaustion requirement "reduces friction between the state and federal court systems by avoiding the unseem-[liness] of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (internal quotation marks and citation omitted). Thus, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" — which includes "petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State." *Id.* at 845, 847. And this opportunity must be given by fairly presenting to the state court "both the operative facts and the controlling legal principles" associated with each claim. *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000) (citing *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) (internal quotation marks omitted). In other words, the ground must "be presented face-up and squarely." *Mallory v. Smith*,

27 F.3d 991, 995 (4th Cir. 1994) (citation and internal quotation marks omitted).

In his petition to the South Carolina Supreme Court, Longworth's only ineffective-assistance ground (aside from his conflict-of-interest claim) did not address the issues raised in the habeas petition filed in the district court, but instead concerned his counsels' alleged deficiency in responding to the trial judge's statement to Longworth regarding the scope of cross examination should Longworth have chosen to testify. Longworth argues that "[t]he heart of the [ineffective-assistance] claim based on conflict and the general [ineffective-assistance] claim are the same — trial counsel failed to develop and present substantial available mitigating evidence that was material to punishment." We do not agree. Indeed, Longworth himself conceded before the district court that the general ineffective-assistance claim was not raised in his petition for certiorari filed in the South Carolina Supreme Court. Because Longworth's general ineffective-assistance claim made here and the operative facts now advanced in support of that claim were not presented to the South Carolina Supreme Court and because that court would now treat the claim as procedurally barred, *see* S.C. Code Ann. § 17-27-100; S.C. App. Ct. R. 203, 227, we conclude that we may not now review the claim.[2]

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

---

[2]To show cause and prejudice, Longworth requests that we reconsider our precedent holding that ineffective assistance of state habeas counsel cannot excuse procedural default given that there is no Sixth Amendment right to effective assistance of counsel in state habeas proceedings. *See Mackall v. Angelone*, 131 F.3d 442, 449 (4th Cir. 1997) (*en banc*). Of course, we are not free to do so. *See Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir. 1996).