**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 20-6426**

MATTHEW JAMES HORNER,

Petitioner - Appellee,

v.

JEFFERY NINES, Acting Warden; ATTORNEY GENERAL OF THE STATE OF MARYLAND,

Respondents - Appellants.

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, Chief District Judge.  (1:12-cv-02582-JKB)

Argued:  December 8, 2020                Decided:  April 20, 2021

Before KING and QUATTLEBAUM, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Vacated and remanded by published opinion.  Senior Judge Traxler wrote the opinion in which Judge King and Judge Quattlebaum joined.

**ARGUED:**  Daniel John Jawor, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants.  Pascal Frank Naples, III, SHIPMAN & GOODWIN LLP, Hartford, Connecticut, for Appellee.  **ON BRIEF:**  Brian E. Frosh, Attorney General, Cathleen C. Brockmeyer, Assistant Attorney General, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellants.  Mark Elliott Schamel, Ana L. Jara, Christopher Michael Schafbuch, WOMBLE BOND DICKINSON (US) LLP, Washington, D.C.; Christopher T.

Pickens, HOGAN LOVELLS US LLP, Tysons, Virginia; Joette Katz, SHIPMAN & GOODWIN LLP, Hartford, Connecticut; Shawn M. Armbrust, Isabel R. Corngold, MID-ATLANTIC INNOCENCE PROJECT, Washington, D.C., for Appellee.

---

TRAXLER, Senior Circuit Judge:

Matthew Horner ("Horner") filed an application for a writ of habeas corpus under 28 U.S.C. § 2254, seeking relief from his convictions in Maryland state court for attempted first degree murder, first degree assault, use of a handgun in the commission of a crime of violence, and second degree assault. Horner claims that he is entitled to habeas relief because (1) he did not knowingly and voluntarily waive his right to a jury trial, in violation of *Patton v. United States*, 281 U.S. 276 (1930); (2) the prosecution suppressed material evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (3) he received ineffective assistance from his legal counsel, in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). The district court granted relief in part on Horner's *Patton* and *Brady* claims and dismissed his *Strickland* claims without prejudice. The Respondents appeal.

Upon careful review, we hold that the district court's decision to grant Horner habeas relief runs contrary to the deference that federal courts are required to afford state court adjudications of federal constitutional claims. Accordingly, we vacate the district court's decision and remand for further proceedings.

## I. Background

Horner's convictions arise out of two separate incidents of domestic abuse of his former wife, Laraine Horner ("Laraine"), in 2005. The first incident occurred on October 11th. Horner and Laraine shared a bedroom in the basement of Horner's parents' home. Horner, who had been drinking alcohol, and Laraine were arguing. The argument escalated into Horner hitting and choking Laraine. He left red marks on her neck and broke open stitches she had on her arm from a recent surgery. After the altercation, Laraine drove to

3

a nearby gas station and called the police. Horner drove to the home of his girlfriend, Lisa Richards, where he stayed for the next few days. He was charged with second degree assault, and he was arrested at his home on October 14th.

The second incident occurred around 6:15 a.m. on October 15th, just after Horner's father bailed Horner out of jail. Horner and his father drove back to the home, where Laraine was sleeping. Horner entered their bedroom, stood over Laraine, and "told her 'that it was going to be the last time that [she] sent him to jail.'" J.A. 519. Horner then "grabbed her and shot her once under the chin. The bullet traveled through the roof of her mouth, knocked out all but three of her teeth, and exited her forehead." *Id.* After Horner fled, Laraine made her way up from the basement with a bloody towel wrapped over her face. She was dazed and confused, could not speak, and could only respond to questions by moving her head. Horner's stepmother called 911.

Officer Mertz was the first officer to arrive on the scene. He obtained Horner's cell phone number and called him. Horner falsely claimed that he was driving to work, but refused to tell the officer where he worked. In actuality, Horner was again on his way to Lisa Richards' house, where he stayed for the next two days. Horner also told Officer Mertz that he was in "lock-up" when Laraine was injured, and that "whatever she did it must have been self-inflicted." J.A. 1335. At the time, however, the responding paramedics and police believed that Laraine had sustained a blunt force trauma to her head. It was only discovered that she had been shot when she was examined at the hospital.

Detective Joseph Alex with the Investigative Services Unit of the Baltimore County Police Department was assigned as a primary investigator. Horner's stepmother told

Detective Alex that Horner had a history of abusing Laraine. The police found blood on the bed where Laraine slept, but no firearm was found in or close to the bed. A nine-millimeter semi-automatic Browning pistol belonging to Horner's father was found in a gun case in the corner of the room. The firearm was jammed. There were no fingerprints found on the gun, no blood trail from the bed to the firearm, and no visible signs of blood on the gun or the case. As soon as it was discovered that Laraine had been shot, her hands were bagged and tested. Gun residue was not detected on her hands.

At the hospital, Laraine positively identified Horner as the shooter and described the clothes he was wearing when he fled the home. Horner was charged with attempted murder, first degree assault, and the use of a handgun in the commission of a crime of violence. Two days later, Horner turned himself in to police, but denied that he had shot Laraine. The police executed a search warrant at Lisa Richards' house, where they found the clothes that Laraine had described and Laraine's personal computer.

While in jail, Horner was housed in close proximity to Richard Shaffer. Shaffer was in jail awaiting sentencing on convictions for armed robbery, robbery and second degree assault. According to Shaffer, during one of their conversations, Horner admitted that he shot Laraine. Shaffer had previously served as a drug informant for Detective Ed Hann with the Narcotics/Vice Unit of the Baltimore County Police Department, and Shaffer asked his girlfriend to contact Detective Hann about Horner's confession. Detective Hann, in turn, relayed the information to Detective Alex. Detective Alex interviewed Shaffer on three occasions, during which Shaffer relayed Horner's confession:

5

[A]fter [Horner] was bailed out of jail for assaulting Laraine, he went home, an argument had ensued and he pulled his father's pistol out and there was a brief struggle [and] two shots were fired.

Shaffer testified that [Horner] told him that he shot Laraine under the chin with his father's 9mm pistol. According to Shaffer, [Horner] said one round went into the ceiling, another round went into the headboard and the gun jammed. Then, according to Shaffer, [Horner] stated that he wiped the gun off and placed it back in the case. [Horner] left the crime scene, bought new clothes, parked his truck in Baltimore City and had his girlfriend Lisa Richards take him to her home where he washed off gunpowder residue and changed clothes.

J.A. 2317 (internal quotation marks and citations omitted).

On May 8, 2006, Horner waived his right to a jury trial and was tried before Judge Mickey Norman. The prosecution's theory was that Horner was physically abusive to Laraine during their marriage, that he abused her on October 11th, and that he shot her on October 15th in retaliation for her having him arrested. Defense counsel's theory was that Horner immediately left the home in his truck on the morning of the shooting and never entered the home. Horner suggested that Laraine, who had a prior history of drug overdoses, shot herself.

At the conclusion of the trial, Judge Norman found Horner guilty of the charges and detailed the evidence he found significant to his decision:

The evidence before the Court is that this chain of events starts on or about October 11th . . . in the early evening hours when Miss Horner testifies that she is assaulted by her husband, subsequently leaves the home, goes to the Exxon station . . . where she meets . . . Officer Minton, and he observes some injuries that have been introduced in evidence in terms of photographs and corroborated by at least the testimony of Miss Horner.

[T]he uncontroverted testimony is that she does not return home that evening but does return home on the 12th. . . . [T]he Defendant leaves the home and winds up spending the next couple of days with his girlfriend, Lisa. Miss

6

Horner . . . takes out an application for statement of charges to charge the Defendant with second degree assault. . . .

The Defendant is arrested on Friday, released somewhere around or actually gets out of jail and transported, if you believe his father, somewhere around 4 o'clock in the morning or so. The defense would have you believe that he arrives home, gets from his father's truck into his truck, his father thinks he is going to work but he winds up going to Lisa's without changing clothes.

When evaluating evidence you have to look at what stares you in the face and the reasonable and logical inferences that you can draw from the evidence presented. Let's assume for the sake of argument that Laraine's testimony is inaccurate, that it is false. You would have to believe that she shot herself . . . with the purpose of doing one of two things: Either killing herself or setting her husband up for an attempted murder.

Now, it is a pretty risky thing to shoot yourself under the chin figuring that you are going to live and then have sufficient control of what I imagine is somewhat painful to do all the things that the defense suggests in this case. . . . Because you put the gun to your chin and what is the distinct possibility you are not going to live? You attempt to kill yourself and then that doesn't work. You would have to believe that she attempted to kill herself, she failed that attempt, she is dazed from a pretty substantial wound and in that dazed state she decides oh, okay, the next best thing to do is to frame my husband. So I drag myself out of bed, I take a weapon, I wipe it off, I put it in a box and I go upstairs and ultimately am taken to the hospital. Well, that just doesn't make any sense. If indeed this weapon, this nine millimeter is not the weapon that was used . . ., then the weapon . . . that inflicts this injury is removed but it is not found by the police. So she would have to have secreted it somewhere else in the house. We know that she goes from the basement floor to the living room and then off to the hospital.

The significance, I think, of Mr. Shaffer's testimony, and I paid very close attention to all the testimony in the case, but one of the things that we tell jurors is that . . . you pay particular attention to the testimony of someone who has something to gain. And clearly in this case the State intends to recommend a reduced sentence for Mr. Shaffer. The Court is not bound by that recommendation. But they intend to make that recommendation. And he comes forward to testify.

So the Court paid particular attention, if you will, to Mr. Shaffer's testimony. And a couple of the things that the Court found significant, and it is not always going to be 100 percent, he said that the Defendant told him

that he used his father's pistol, a struggle ensued, and he shot her under the chin. He said the Defendant says two shots. He says the Defendant told me he wiped off the gun and put it in the case, and that the gun jammed. Now, I find that particularly significant, that he said that the gun jammed, because there is only a couple of ways he would know that. He would either know it from reading it somewhere or being told that by somebody. There is no evidence in this case that he read it anywhere. . . . And I listened very carefully to determine if Mr. Shaffer could have learned that tidbit of evidence from a charging document perhaps, or if the Defendant himself told him that, or perhaps [another person] who testified . . ., but there wasn't any evidence of that.

So how would Mr. Shaffer possibly know an unrefuted fact? And that unrefuted fact is that Officer Lipsitz . . . finds that weapon, he photographs that weapon, and he describes it. And he says the weapon is jammed because there was a round in it. And Shaffer says that [Horner] wiped off the gun, put it in a case, and the gun jammed.

. . . . How does Shaffer know [the gun is jammed]? Only way he could know it is if someone told him or he read it. There is no information to the Court that he read it anywhere.

Officer Mertz is the first person on the scene. He got there about 7:11 a.m.. He testifies that Mr. Horner gave the Defendant's cell phone number to the police, that they called him, spoke with a person who identified himself as the Defendant and the Defendant says "whatever happened, it must have been self-inflicted", and that is a quote.

. . . . Lipsitz tells us in testimony that Mertz told him the victim suffered blunt force trauma. When Mertz is talking to the Defendant, he doesn't even yet know that the victim has been shot. And that is verified by what Lipsitz says because Lipsitz says Mertz thinks it is blunt force trauma. Yet out of nowhere this call between the defendant and Mertz, the Defendant says whatever happened, it must have been self-inflicted. Miss Horner testifies that [Horner's father] allowed her to borrow a gun [before]. . . . When Officer Alex talked to the Defendant later in the day, and by that time certainly the Defendant was aware [from other sources] that his wife had been shot . . ., he says, . . . "my Dad lent her that gun." [Horner's father] got on the witness stand, under oath, and said he would have never given her a gun and I think his words were, "he wouldn't trust her with a pack of cigarettes."

So Miss Horner says he lent her a gun. The Defendant says that he has lent her that gun in the past, but [Horner's father] denies it. Mrs. [Mary]

8

> Horner gets on the stand and testifies . . . , and she denies that she told Detective Alex that Defendant had a history of domestic abuse, that she was getting tired of the problem. That has been rebutted by the detective.
>
> [Laraine] testified that she had complained of domestic abuse before. Is it a coincidence that she is shot on the morning of October 15th? Laraine Horner comes home the 12th. If she wanted to kill herself, she could have done it then. She could have killed herself on the 13th. She could have killed herself on the 14th. But lo and behold, she attempts to kill herself on the same morning that the Defendant is released. That is just a little too coincidental, if you believe that she attempted to kill herself.

J.A. 1042-49. In sum, the trial judge credited the testimony of Laraine and Schaffer, which was corroborated in part by the police officers and the evidence at the scene; discredited the testimony of Horner and his parents; and convicted Horner of the charges.

Before he was sentenced, Horner obtained new defense counsel, Gary Proctor, who pursued a motion for a new trial. The motion was denied. Horner was sentenced to life imprisonment for the attempted first degree murder conviction, twenty years for the use of a handgun conviction, and ten years for the second-degree assault conviction, to run concurrently with his life sentence. On appeal to the Maryland Court of Special Appeals, Mr. Proctor claimed that Horner had not knowingly and voluntarily waived his right to a jury trial. The court affirmed Horner's convictions, and the Maryland Court of Appeals denied certiorari review.

## II. Postconviction Proceedings

In September 2008, Horner, again represented by new counsel, Booth Ripke and Larry Nathans, filed a petition for postconviction relief in Maryland state court. Pertinent to this appeal, Horner raised two *Brady* claims: (1) that the State failed to disclose that Shaffer was not only a drug informant for Detective Hann, but that he had also been *paid*

9

for his informant activities; and (2) that the State failed to disclose that Shaffer was promised a more lenient sentencing recommendation than was disclosed. Horner also raised several *Strickland* claims. The state PCR court denied relief, and Horner's request to appeal was denied.

In August 2012, Horner filed a *pro se* petition for habeas relief in federal court under § 2254. He later acquired legal counsel, Mark Schamel, who filed an amended petition in November 2014. In this petition, Horner claimed, *inter alia*, that his waiver of his right to a jury trial was not knowing and voluntary; that the state violated *Brady* by failing to disclose that Shaffer had previously served as a *paid* informant for Detective Hann; and that the state violated *Brady* by failing to disclose the true extent of Shaffer's sentencing deal. Horner also raised several *Strickland* claims, including a new claim that trial counsel failed to adequately advise him of his right to a jury trial.

In February 2016, Mr. Schamel notified the district court that Shaffer and Laraine had given statements that contradicted their trial testimony. The district court granted the parties' joint motion to stay the federal habeas proceedings to allow Horner to file a motion to reopen the state postconviction proceedings to explore the new evidence.

In his motion to reopen the state postconviction proceedings, however, Horner did not limit his motion to the new evidence. Horner also sought to relitigate his claims that the State had violated *Brady* by failing to disclose that Shaffer was a *paid* informant and the true extent of their sentencing deal with Schaffer. The state PCR court granted Horner's motion to reopen his state PCR proceedings, but only to explore the claims based upon the newly-acquired evidence. Horner's request to relitigate other claims was rejected because

10

those claims had been fully and finally litigated in the prior state court proceedings, or waived by Horner's failure to timely raise them in prior proceedings, and the court did not find that it was in the interest of justice to reopen the proceedings to address them. *See* Md. Code Ann., Crim. Proc. § 7-106.

During a three-day evidentiary hearing, the state PCR court explored the new evidence. In a nutshell, Shaffer and Laraine had executed affidavits claiming that they had no independent knowledge of Laraine's shooting, and that their testimony was based upon evidence the prosecutor, Ms. Schiffer, and Detective Alex gave them. At the hearing, however, Shaffer and Laraine both recanted the affidavits, and reaffirmed their trial testimony. Ms. Schiffer and Detective Alex also denied coaching the witnesses. The state PCR court credited the testimony of these witnesses and denied relief. The Maryland Court of Special Appeals denied leave to appeal.

Having exhausted his new evidence claims, Horner returned to federal court and filed a second amended habeas petition. In addition to his invalid waiver of jury trial claim under *Patton*, Horner pursued five of the *Brady* claims that he had raised before the state PCR court, and contended that the State failed to disclose: (1) that Shaffer was a paid informant; (2) the full extent of the sentencing deal with Shaffer; (3) that Shaffer's trial testimony was based on information he obtained from Detective Alex; (4) that Laraine told Detective Alex and Ms. Schiffer that she had no independent memory of the shooting; and (5) that Laraine's trial testimony was based on information she obtained from Detective Alex and Ms. Schiffer. Horner also sought to raise a new *Brady* claim, asserting that the

11

prosecution failed to disclose that Detective Alex had discredited Shaffer's claim that Horner had also confessed to being responsible for two other deaths.

In February 2020, the district court granted habeas relief on Horner's *Patton* claim and all six of his *Brady* claims, and dismissed the *Strickland* claims without prejudice.[1]

### III.  Standard of Review

We review *de novo* the district court's grant of federal habeas relief to Horner on the basis of the state court record.  *See Elmore v. Ozmint*, 661 F.3d 783, 849 (4th Cir. 2011). In doing so, however, "we are guided and restricted by the statutory language of 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA], and a wealth of Supreme Court precedent interpreting and applying this statute." *Richardson v. Branker*, 668 F.3d 128, 132 (4th Cir. 2012).

While not insurmountable, the AEDPA standard "serves important interests of federalism and comity," and it "is intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (internal quotation marks omitted).  It rests on the recognition that "state courts are the principal forum for asserting constitutional challenges to state convictions," *Harrington v. Richter*, 562 U.S. 86, 103 (2011), and that habeas corpus proceedings are a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal," *id.* at 102-03 (internal quotation marks omitted).

---

[1] Horner's claims that the prosecution had also knowingly allowed Shaffer and Laraine to testify falsely, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), were denied by the district court.  Horner does not challenge that ruling on appeal.

First, a writ of habeas corpus shall not be granted unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). "A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). One manner in which procedural default occurs is "when a habeas petitioner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* (internal quotation marks omitted).

Second, if the prisoner *has* exhausted his state court remedies, and obtained an adjudication from the state court on the merits of his claim, we are constrained by the provisions of 28 U.S.C. § 2254(d) and (e)(1). We may grant federal habeas relief only if the state court's adjudication of a claim on the merits "resulted in a decision" that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Taking these principles together, "[w]e consider whether the state PCR court based its decisions on an objectively unreasonable factual determination in view of the

13

evidence before it, bearing in mind that factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Elmore*, 661 F.3d at 850 (internal quotation marks omitted). "We must be especially deferential to the state PCR court's findings on witness credibility, and we will not overturn the court's credibility judgements unless its error is stark and clear." *Id*. (internal quotation marks and citations omitted).

Finally, we are limited in the evidence we can consider when we evaluate the state court's adjudication of a particular constitutional claim. "By its plain terms, § 2254(d)(2) limits our review to the evidence placed before the state PCR court." *Elmore*, 661 F.3d at 850. Because the "backward-looking language [of § 2254(d)(1)] requires an examination of the state-court decision at the time it was made[,] . . . the record under review is limited to the record in existence at that same time." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

With these principles in mind, we will now address each of Horner's claims in the order in which they were presented to the state courts.

## IV. *Patton* claim

We begin with Horner's claim that the state court's adjudication of his Sixth Amendment jury trial claim involved an unreasonable application of clearly established Supreme Court precedent in *Patton*. We disagree.

The right to trial by jury is a fundamental constitutional right. *See Duncan v. Louisiana*, 391 U.S. 145, 157-58 (1968). In *Patton*, the Supreme Court addressed the question of *whether* an accused can waive this fundamental right and held that he may

14

indeed "forego [it] at his election." 281 U.S. at 298. Although "[t]rial by jury is the normal and, with occasional exceptions, the preferable mode of disposing of issues of fact in criminal cases," *id.* at 312, the Court noted that the right is "a privilege" belonging to the accused, not an "imperative requirement," *id.* at 298, and one that exists "primarily for the protection of the accused," *id.* at 297. This right to waive a jury, however, is not an "absolute right." *Singer v. United States*, 380 U.S. 24, 34 (1965). As the *Patton* Court explained:

> Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of the government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant. And the duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity.

*Patton*, 281 U.S. at 312-13.

"[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 278 (1942). In *Adams*, the Supreme Court considered the question of whether an accused can waive his right to a jury trial *without* the recommendation of legal counsel. And, again, the Court held that he can.

> The short of the matter is that an accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury, and so likewise may he competently and intelligently waive his Constitutional right to the assistance of counsel. There is nothing in the Constitution to prevent an accused from choosing to have his fate tried before

15

a judge without a jury even though, in deciding what is best for himself, he follows the guidance of his own wisdom and not that of a lawyer.

*Adams*, 317 U.S. at 275.

In the wake of *Patton*, courts adopted rules to guide a particular court's exercise of its discretion, including our own Federal Rule of Criminal Procedure 23. *See* Fed. R. Crim. P. 23, advisory committee notes to 1944 adoption. Maryland has a similar rule. *See* Md. Rule 4-246(b). The United States Supreme Court, however, has *never* imposed any constitutionally-mandated writing or colloquy for a waiver to be effective. *Patton* requires, no more and no less, that the court exercise its sound discretion in light of the unique circumstances of the case before it and determine that the accused's waiver is knowing and voluntary, that the state has consented to the waiver, and that proceeding with a bench trial would not be an "unreasonable or undue departure[]" from the normal mode of trial. *Patton*, 281 U.S. at 312. "The question in each case is whether the accused was competent to exercise an intelligent, informed judgment—and for determination of this question it is of course relevant whether he had the advice of counsel." *Adams*, 317 U.S. at 277.

Moreover, once the trial court has accepted the waiver, the burden rests upon the petitioner to establish that he did *not* competently and intelligently waive his constitutional rights.

> The *Patton* decision left no room for doubt that a determination of guilt by a court after waiver of jury trial could not be set aside and a new trial ordered *except upon a plain showing that such waiver was not freely and intelligently made.* If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality. Simply because a result that was insistently invited,

16

> namely, a verdict by a court without a jury, disappointed the hopes of the accused, ought not to be sufficient for rejecting it.

*Adams*, 317 U.S. at 281 (emphasis added); *cf. Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("It must be remembered . . . that a judgement cannot be lightly set aside by collateral attack, even on *habeas corpus*. When collaterally attacked, the judgment of a court carries with it a presumption of regularity. . . . [T]he burden of proof rests upon [the defendant] to establish that he did not competently and intelligently waive his constitutional right[s].").

Under AEDPA, the petitioner bears an even heavier burden; he must demonstrate that the state court's determination that he failed to carry his burden rises to the level of an unreasonable determination of the facts or an unreasonable application of the principles espoused in *Patton* to the facts. *See* 28 U.S.C. § 2254(d).

## A.

On the morning of Horner's trial, defense counsel informed Baltimore County Circuit Court Administrative Judge Turnbull that Horner had elected to waive his right to a jury trial. *See* Md. Rule 4-246(b) ("A defendant may waive the right to a trial by jury at any time before the commencement of trial."). The following exchange then took place between Judge Turnbull, Horner's counsel, and Horner:

> The Court: Mr. Horner, you have the right to a jury trial. That is 12 people chosen at random from the community. You would have the right to participate in the selection of those jurors and any verdict they render must be unanimous. They must find you guilty beyond a reasonable doubt and to a moral certainty. Do you understand what a jury is?
>
> The Defendant: Yes, sir.
>
> The Court: Do you wish to be tried by a jury or do you wish to waive that right?

The Defendant:  I wish to give it to my attorney to decide.

[Horner's Counsel]:  You told me you want to waive that right.

The Court:  Court trial?

[Horner's Counsel]:  Court trial.

The Court:  Judge Norman is ready for you.

J.A. 1680.

When Horner appeared before Judge Norman, the issue of Horner's jury waiver was revisited:

The Court:  Is this Mr. Horner?

The Defendant:  Yes.

The Court:  Good morning, sir.  Has he ever been advised of his right to a court trial?

The Defendant:  I'm going to agree with my attorneys.

[Defense Counsel]:  He was qualified.

[Defense Co-Counsel]:  We can do it again.

The Court:  If you are satisfied.  It was done in front of Judge Turnbull?

[Prosecutor]:  It was, Your Honor.

J.A. 1265.  At no point thereafter did defense counsel ask that Horner be further advised of his rights or object to proceeding with a bench trial.  Nor did Horner, who testified during trial, indicate that he wanted to withdraw his waiver or assert that he had not been properly advised of his rights.

18

Mr. Proctor, who replaced Horner's trial counsel while a new trial motion was pending, likewise did not seek to revisit the issue before the trial court. The issue was first raised on direct appeal. But, even then, Horner did not claim that he was not competent to exercise an intelligent, informed judgment, or that his waiver was not freely and intelligently made. Rather, Horner claimed that the "jury trial waiver colloquy" was insufficient to establish that he had knowingly and voluntarily waived his right. J.A. 464. Specifically, Horner argued that the trial judge should have asked "byte-sized" questions, instead of giving "one long explanation" of his right to a jury trial. J.A. 465. He also claimed that his decision to follow the recommendation of his attorney was insufficient to effectuate the waiver.

The Court of Special Appeals of Maryland considered and rejected Horner's arguments at length:

> [A]ppellant's waiver was knowing and voluntary. Pursuant to [Maryland] Rule 4-426(b), appellant was advised "on the record in open court" about his right to a jury trial. . . . Judge Turnbull advised appellant that he had the "right to a jury trial," that a jury is "12 people chosen at random from the community," that appellant would have "the right to participate in the selection of" the jury, that the jury's verdict "must be unanimous," and that the jury must find appellant "guilty beyond a reasonable doubt and to a moral certainty." In response to Judge Turnbull's inquiry as to whether he understood the advisements, appellant responded "Yes, sir."
>
> It is clear from this record that appellant had more than "some knowledge of his jury trial rights" and that his knowledge was "at least enough to satisfy the trial court that he knowingly waived his jury trial right." [*State v. Bell*, 351 Md. 709, 727 (1998)].
>
> Appellant's contention that the circuit court erred in giving "one long explanation," instead of "byte-size" questions is also without merit. As we stated earlier, the court need not recite a "fixed incantation," *Martinez* [*v. State*, 309 Md. 124, 134 (1987)], and . . . giving "one long explanation" is an

19

acceptable way for the court to satisfy itself that a defendant's waiver is knowing and voluntary.

Likewise, appellant's argument that his lawyer, but not he himself, waived his right to a jury trial, is unpersuasive. Admittedly, the Court of Appeals has found that, where defense counsel "merely reported to the court that he had made inquiry of his client out of court and given the client the information necessary for an effective election," and then waived his client's jury trial right without his client saying anything at all, the waiver was insufficient. *Countess v. State*, 286 Md. 444, 458-59 (1979). Indeed, it has instructed that "responses to the inquiry must come from the defendant himself." *Id.* at 459.

However, in the instant case, the "responses to the inquiry" did "come from the defendant himself." *See id.* After informing appellant of his right to a jury trial, Judge Turnbull asked if he "wish[ed] to be tried by a jury or . . . to waive that right[.]" Appellant answered "I wish to give it to my attorney to decide." His attorney then said, "You told me you want to waive that right."

Although appellant did not specifically say "I wish to waive my right to a jury trial" when asked, appellant was fully informed of his rights, answered the court, and did not disagree when his attorney said to him, "You told me you want to waive that right." Then, appellant was taken before Judge Norman who asked if he had "ever been advised of his right to a court trial[,]" to which appellant again answered, "I'm going to agree with my attorneys." He said this after his attorney informed the court that appellant had told him he wished to proceed with a bench trial.

If there is no "fixed incantation" that the court must say to inform a defendant of his jury trial rights, there is, to be sure, no "fixed incantation" appellant must repeat to waive that right. In the instant case, appellant was advised on the record of his right to a jury trial. He stated that he understood that right and did not dispute his attorney's assertion that he had said he wanted to waive it. Moreover, he again stated on the record that he agreed with his attorneys in waiving that right. To now claim that he did not knowingly and voluntarily waive the right to a jury trial strains credulity.

J.A. 525-27.

B.

20

The state court's adjudication of Horner's challenge to his waiver was not unreasonable under AEDPA standards. The question on federal habeas review is not whether the district court or this court would require more, or whether we would hold that the trial court abused its discretion in accepting the waiver. "In order for a federal court to find a state court's application of [Supreme Court] precedent unreasonable, the state court's decision must have been more that incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (citation and internal quotation marks omitted). That is, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Horner has failed to satisfy this high threshold. On appeal to the state court, Horner took issue with the colloquy. But, as noted above, Supreme Court precedents do not dictate any particular form of colloquy, or any colloquy for that matter, nor have they required any particular form or expression of the waiver from the accused. Indeed, this court has long recognized that, while "it is much preferable for a district court to insure itself on the record before accepting the defendant's jury waiver, it is not a constitutional imperative." *United States v. Boynes*, 515 F.3d 284, 286 (4th Cir. 2008). "The constitutional imperative is this, no less and no more: the waiver must be knowing, intelligent, and voluntary." *Id.* "[N]either [our] Rule 23(a) nor the Sixth Amendment requires the district court 'to interrogate defendants as to the voluntariness of their waiver of a jury trial.'" *Id*. at 287 (quoting *United States v. Hunt*, 413 F.2d 983, 983 (4th Cir. 1969) (per curiam)); *see also*

21

*United States v. Kahn*, 461 F.3d 477, 492 (4th Cir. 2006) (rejecting claim that a "jury trial waiver was invalid because the district court did not obtain [the defendants'] written waiver or otherwise conduct a colloquy on the record to determine that their waiver was knowing, voluntary, and intelligent").[2]

The question before the Maryland appeals court was whether Horner had made a plain showing that his waiver was not knowing and voluntary. And relevant to the inquiry was the fact that Horner "had the advice of counsel" and followed that advice. *Adams*, 317 U.S. at 277; *cf. Henderson v. Morgan*, 426 U.S. 637, 647 (1976) (noting in a similar context that "it may be appropriate to presume that in most cases defense counsel routinely explain the nature of [an] offense in sufficient detail to give the accused notice of what he is being asked to admit"). The responses of Horner and his defense counsel reveal that counsel clearly conferred with Horner about his right to a jury trial. The trial court also explained the right and asked Horner whether he wanted to waive the right. And Horner personally advised the court that he was in agreement with his counsel's advice. Accordingly, we cannot say that the state court's rejection of Horner's claim was unreasonable.

Nor do we take issue with the state court's rejection of Horner's claim that his constitutional rights were violated because counsel, rather than he, waived the right. To be sure, "certain decisions regarding the exercise or waiver of basic trial rights are of such

---

[2] Although our precedents cannot serve as clearly established Federal law for purposes of § 2254(d), *see White v. Woodall*, 572 U.S. 415, 420 n.2, they are not without relevance. As the Court has also recognized, "diverging approaches to [a particular] question" in the Courts of Appeal "illustrate the possibility of fairminded disagreement." *Id.* at 422 n.3.

moment that they cannot be *made* for the defendant by a surrogate. A defendant . . . has the ultimate authority to determine whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (internal quotation marks omitted). With regard to these decisions, counsel "must both consult with the defendant and obtain consent to the recommended course of action." *Id.* But here, counsel *did* consult with Horner and obtained Horner's consent to the recommended course of action. We know this because Horner said so. By agreeing with counsel's recommendation, Horner plainly made the personal choice to waive his right to a jury trial. For the same reasons, we can summarily dispose of Horner's claim that he merely acquiesced in a waiver of his rights based on a "silent record." *Boykin v. Alabama*, 395 U.S. 238, 243 (1969) (holding that the court "cannot presume a waiver of . . . important federal rights from a silent record"). As the state court found, this record was not silent, nor was Horner.

Finally, we find no merit in Horner's suggestion that his waiver could not have been knowing or voluntary because it would have been *per se* unreasonable to waive a jury right in his circumstances. As the Supreme Court has recognized, "trial by jury confers burdens as well as benefits" which is why "an accused should be permitted to forego its privileges when his competent judgment counsels him that his interests are safer in the keeping of the judge than of the jury." *Adams*, 317 U.S. at 278. As the Maryland courts have also observed,

> any experienced lawyer worth his salt in the trial of criminal matters knows that there are many, many instances where trial before the court is in the best interest of the accused. . . . The defendant may want to waive a jury trial

23

when he feels that a jury panel composed of members of the community will be prejudiced against his case. This may be especially true when the defendant's alleged crime has received wide publicity or is particularly gruesome. The defendant may also feel that a judge would be less apt than a jury to draw negative conclusions from the defendant's appearance or manner of speech. Or, he may merely prefer that the arbiter of his fate be one person trained in the law rather than twelve laymen.

*Martinez v. State*, 522 A.2d 950, 953 n.5 (Md. 1987) (internal quotations marks omitted).

To conclude, the burden rested squarely on Horner to make a plain showing to the state appellate court that his waiver was not knowing and voluntary, and to demonstrate to the federal courts that the state court's adjudication "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Because Horner has failed to satisfy this burden, we vacate the district court's grant of habeas relief on Horner's *Patton* claim.

V. *Brady* Claims

We turn next to Horner's claims that he is entitled to federal habeas relief because the prosecution withheld favorable evidence in violation of *Brady*. "[T]he suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a *Brady* violation, the accused must demonstrate that the evidence was (1) suppressed by the prosecution; (2) was favorable to the defendant, either because it is exculpatory or impeaching; and (3) was material. We will address Horner's six *Brady* claims in the order in which they were

24

presented to the state courts, and in light of the evidence that was before the state court when each claim was adjudicated.

### A. The First Postconviction Claims

We begin with Horner's claims that the prosecution withheld evidence that Shaffer was a *paid* informant and that the sentencing deal with Shaffer was more lenient than had been disclosed. Both claims were raised and adjudicated during the initial state postconviction proceedings.[3]

### 1. Paid Informant Claim

Horner asserts that the prosecution violated *Brady* by failing to disclose that Shaffer was not only a prior drug informant, but that he had also been *paid* on occasion for the information he provided. The state PCR court held that the prosecution did not suppress this evidence and, in the alternative, that the evidence was not material.

The *Brady* disclosure requirement rests with the prosecution. But to comply with *Brady*, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). This is because "police investigators sometimes fail to inform a prosecutor of all they know," but "procedures and regulations can be established

---

[3] Horner attempted to re-adjudicate these claims when he filed his motion to reopen the state postconviction proceeding, but the request was denied in accordance with state court procedures. Accordingly, we review the claims based solely on "the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

to carry the prosecutor's burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Id*. at 438 (internal quotation marks and alteration omitted).

Horner confessed to Shaffer that he shot Laraine. Shaffer's girlfriend contacted Detective Hann, Shaffer's prior drug handler. Because the information did not pertain to drug dealing activities, Detective Hann tracked down the investigator in the Horner case, Detective Alex. Detective Hann told Detective Alex that Shaffer had been a reliable drug informant for him in the past, and he accompanied Detective Alex to the Baltimore County Detention Center to introduce him to Shaffer. Detective Alex sat in the only available chair on the other side of Shaffer, separated by a glass partition, and interviewed Shaffer alone. Detective Hann stood nearby, but he did not participate in the questioning or pay attention to the interview. Detective Hann did nothing further. He was never an investigator on the case, and he did not otherwise act on the case on behalf of the police department or the prosecutor's office. Detective Hann never told anyone associated with the Horner investigation or prosecution that Shaffer had been paid on occasion for his drug-informant activities. During discovery, the State provided defense counsel with the identity of Shaffer along with copies of the written summaries of the meetings between Detective Alex and Shaffer. Defense counsel was told that Shaffer was an informant for a narcotics detective, but it was not disclosed that Shaffer had been paid on occasion for his drug informant activities.

(a)

26

Horner argues that the prosecution had a duty to learn from Detective Hann that Shaffer was *paid* for his drug informant activities and, therefore, that Detective Hann's knowledge must be imputed to the prosecution. The state PCR court rejected the claim because:

> [Horner] has not established that the individual prosecutors, any employee of the State's Attorney's Office or any police officer *participating* in his prosecution knew that Shaffer had been a *paid* drug informant. Detective Hann's connection to [Horner's] cases was tangential, at best. He did not participate in the investigation or evaluation of the State's case against [Horner]. He was not a member of the Investigative Services Unit of the police department and did not report to the State's Attorney's Office in reference to [Horner's] cases.

J.A. 556.

The question of whether Detective Hann's knowledge should be imputed to the prosecutor in this situation may be an unsettled one. And some courts may even find it to be a close one. But that is not enough to grant federal habeas relief. As this court has recognized, there are no "hard and fast lines . . . about the scope of *Brady* imputation." *United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010). "[P]rosecutors have a duty to learn of exculpatory evidence gathered by those acting on the government's behalf," but we have also rejected a framework that "would . . . impose unacceptable burdens on prosecutors and the police." *Id.* "Courts have routinely refused to extend *Brady*'s constructive knowledge doctrine where doing so would cut against the agency principles underlying imputed knowledge and would require prosecutors to do full interviews and background checks on everyone who touched the case." *Id.*

27

Here, the state court found that Detective Hann was not a "police investigator" assigned to the case, nor had he acted on the behalf of the investigating division or the prosecution team. We cannot say that these factual findings were unreasonable or that the state court's application of the controlling Supreme Court precedent to them was unreasonable.[4]

(b)

We also see nothing unreasonable in the state court's conclusion that Shaffer's "paid" status was not material for purposes of *Brady*. *Brady* does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. A finding of materiality of the evidence is required under *Brady*." *United States v. Bagley*, 473 U.S. 667, 677 (1985) (internal quotation marks and alterations omitted). Favorable "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682.

Shaffer's informant activities exclusively involved his snitching on drug dealers for the Vice/Narcotics Unit of the Baltimore County Police Department, for which he was paid

---

[4] On appeal, Horner seeks to rely upon testimony elicited from Detective Alex and Ms. Schiffer during the *second* evidentiary hearing conducted by the state PCR court. This hearing took place years after this *Brady* claim was finally adjudicated by the state court. As noted above, AEDPA limits our review of the claim to the evidence that was before the state PCR court when the claim was adjudicated.

$25 to $50, and an occasional controlled buy from a drug dealer, for which he may have received up to $100. But Shaffer never testified in any of the cases in which he provided information, much less received any monetary consideration to testify against any defendant. Shaffer received no monetary consideration for his testimony in Horner's case. The only consideration he received was the prosecutor's promise of a lenient sentencing recommendation on his robbery and related charges, which was disclosed to the defense.

In light of all of the evidence, the state court concluded that the fact that Shaffer had occasionally been paid for his informant activities was not material for purposes of *Brady*:

> Shaffer's testimony, while important to the State [in the attempted murder case], was not the only direct link between [Horner] and the crimes for which [he] was convicted. The victim, Laraine Horner, survived, identified [Horner] as her assailant after the shooting and at trial. The State's evidence established a motive ([Horner]'s arrest on the Second Degree Assault charge) as well as the opportunity to commit the crimes. [Horner] was at the Horner home at the time of the shooting on October 15, 2005 (though [Horner] denied ever entering the home). When the first officer (Mertz) arrived on the scene after the shooting, it was not apparent that Laraine Horner had been shot. Yet, Officer Mertz testified that when he spoke to [Horner] by cell phone, [Horner] immediately explained that "whatever she did it must have been self-inflicted" and added that he was "in lock-up."

> There was additional substantial circumstantial evidence which supported the State's case and negated [Horner]'s defense that Laraine Horner's injuries were the result of a suicide attempt. . . .

> Shaffer's testimony was not material in [the] Second Degree Assault [case] because he offered very little testimony regarding the October 11th incident. More importantly, Laraine Horner testified at trial that on October 11, 2005, [Horner] hit her, pushed her onto the bed and began to strangle her. She reported the incident promptly to police and Police Officer Minton met her at an Exxon gas station soon after the assault. He testified that she appeared upset. He also testified that he observed injuries to Laraine Horner's neck, arm, and leg which were consistent with her description of the assault. Photographs of her injuries were introduced at trial. . . .

J.A. 557-58 (internal citations omitted).

Again, we cannot say that this was an unreasonable evaluation of the evidence or an unreasonable application of *Brady* principles. As summarized by the state courts, there was indeed ample evidence connecting Horner to the crimes. Moreover, Horner was tried before a state court judge as the factfinder. The judge was aware that Shaffer had been a drug informant and that he was testifying in order to receive a reduced sentencing recommendation. The trial judge was keenly aware of the credibility concerns that ordinarily accompany such testimony, and he carefully explained on the record the reasons why he credited Shaffer's testimony. Accordingly, there was no reasonable probability that the trial judge would have rendered a different verdict had he *also* known that Shaffer had occasionally been paid small sums of money for his street-level, drug-informant activities. For these reasons, we cannot say that the state court's determination on materiality was contrary to or an unreasonable application of Supreme Court precedent, and Horner is not entitled to relief.

## 2. More Lenient Treatment Claim

Horner's next claim is that the prosecution violated *Brady* because it failed to disclose the extent of the sentencing recommendation that the prosecution promised Shaffer in exchange for his testimony. As we will explain, Horner has procedurally defaulted federal review of this claim and, even if he had not, he is not entitled to federal habeas relief.

(a)

30

When Ms. Schiffer learned that Shaffer had information about the Horner case, she appeared at a hearing on Shaffer's case and informed the court that Shaffer was cooperating with the prosecution in the Horner case. She also told the court that she was "probably going to be offering [Shaffer] at least the State's withdrawal of the [enhanced penalty] notice because right now he is facing the ten, none suspended" on the armed robbery charge. J.A. 562 (internal quotation marks omitted). On March 20, 2006, Ms. Schiffer sent a letter to Shaffer's trial counsel memorializing the prosecution's offer on the sentencing recommendation. In pertinent part, the letter stated that the prosecution would drop the enhanced penalty notice for the armed robbery conviction, in return for Shaffer's cooperation, and would recommend a sentence of twenty years, with all but four years suspended, followed by supervised probation. A copy of the letter was disclosed to Horner. At trial, Shaffer confirmed the same agreement, testifying that the State offered him "20 years, all suspended but four, with a lengthy probation." J.A. 563 (internal quotation marks omitted).

Horner's *Brady* claim rests upon a statement that Ms. Schiffer subsequently made at Shaffer's sentencing hearing—*after* Horner was convicted. At that hearing, Ms. Schiffer asked the court to recall that the State's recommendation was "ten years suspend all but four." J.A. 563 (internal quotation marks omitted). At the subsequent state PCR hearing, however, Ms. Schiffer "testified that she simply 'misspoke' during Shaffer's sentencing hearing because she was thinking of the fact that the State had withdrawn its notice of enhanced penalties." J.A. 564. She also confirmed that the deal outlined in the March 20 letter was accurate. The state PCR court credited Ms. Schiffer's testimony that she simply

31

misspoke. And because the prosecution *did* disclose the true extent of the sentencing recommendation, the state court held that there was no *Brady* violation.

(b)

The State first argues that Horner procedurally defaulted this claim by failing to raise it in his appeal to the Maryland Court of Appeals. We agree.

A prisoner in state custody "generally must exhaust state court remedies, and a federal habeas court may not review unexhausted claims that would be treated as procedurally barred by state courts—absent cause and prejudice or a fundamental miscarriage of justice." *Longworth v. Ozmint*, 377 F.3d 437, 447-48 (4th Cir. 2004) (internal citation omitted); *see* 28 U.S.C. § 2254(b)(1)(A).

> "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"—*which includes petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State.* And this opportunity must be given by fairly presenting to the state court both the operative facts and the controlling legal principles associated with each claim. In other words, the ground must be presented *face-up and squarely*.

*Longworth*, 377 F.3d at 448 (emphasis added); *see also Breard*, 134 F.3d at 619.

Horner filed his appeal from the state PCR court's decision in October 2010. In his application for permission to appeal, Horner included a footnote in the section dealing with the underlying facts and procedural history of his case that listed *eight* specific *Brady* claims that had been raised and adjudicated below. *See* J.A. at 587-88, n.4 (listing, as one of the postconviction claims raised below, that the State failed to disclose "[t]he fact that . . . the State gave [Shaffer] a significantly better deal at sentencing than was disclosed to

the defense at trial."). But Horner plainly delineated only *six* grounds for appeal. The state PCR court's rejection of his lenient treatment claim was not among them.

Contrary to the district court's ruling, the footnote does not save the claim. It was not included in the six errors identified for appeal, nor did Horner offer any arguments in support of the claim. Because Horner failed to present his lenient treatment claim to the state appellate court "face-up and squarely," as he was required to do to exhaust it, he has procedurally defaulted federal habeas review of the claim.

(c)

Even if Horner had not defaulted the claim, however, he would not be entitled to federal habeas relief on the merits. Horner's *Brady* claim rests upon Ms. Schiffer's description of the State's recommendation during Shaffer's sentencing hearing. But the state PCR court credited Ms. Schiffer's testimony at the hearing and found that she had simply misspoke at Shaffer's sentencing hearing. Horner's deal was *always* a recommendation for twenty years suspended to four years, as reflected in the letter sent to Shaffer's counsel and disclosed to Horner's counsel, and as was confirmed by Shaffer's testimony at trial. *See* J.A. 564 (finding that it was "apparent from a review of the *Horner* trial transcript that when Shaffer testified at Petitioner's trial, he did so in the belief that the State would recommend the sentence set forth in the State's March 20, 2006 letter").

The state PCR court's findings are presumptively valid and not unreasonable, and the court's rejection of Horner's claim based upon these facts involves no unreasonable application of Supreme Court precedent. Because Horner "failed to establish that the State *actually* offered or entered into any agreement with Shaffer *other than* the one disclosed to

33

trial counsel," the State did not suppress any evidence. J.A. 564 (emphasis added). Accordingly, Horner is not entitled to habeas relief on the merits.

## B. The Second Postconviction Claims

Horner's next two *Brady* claims arise out of the affidavits Horner's current counsel, Mark Schamel, and his investigator, Deborah Martin, obtained from Shaffer and Laraine after federal habeas proceedings were initiated. These claims were adjudicated on the merits by the state court in the second round of state postconviction proceedings.

### 1. Shaffer's Affidavit

On September 14, 2015, Shaffer signed an affidavit procured by Mr. Schamel. In the affidavit, Shaffer stated that Horner never told him that he shot Laraine and that Shaffer's testimony was comprised of information that Shaffer had obtained from police reports that were provided to him by Detective Alex. Shaffer stated that he only testified to get a significant reduction in his sentence, and that he had a "tremendous amount of guilt and stress relating to [his] false testimony." J.A. 623.

At the state PCR hearing, however, Shaffer *disavowed* the veracity of this affidavit, denied that Detective Alex fed him information for his testimony, and reaffirmed the substance of his trial testimony. Shaffer explained that he signed the September 14, 2015, affidavit because he was constantly using heroin at the time, and because Mr. Schamel and Ms. Martin had been pressuring his mother and his girlfriend, calling them and visiting their home and workplace. Shaffer's girlfriend confirmed Shaffer's heavy drug use during this time, and Shaffer entered a residential substance abuse treatment program a few months after he executed the affidavit.

34

Ms. Martin testified that they met with Shaffer and told him that they believed he had lied, and that Shaffer told them that he did what he had to do. However, Ms. Martin admitted that Shaffer sent several text messages insisting that he be paid $5,000 for his affidavit. Many of Shaffer's text messages were admitted into evidence and confirm that he was demanding money for his recantation. After being repeatedly denied cash payments, Shaffer changed tack and began to insist that Mr. Schamel help him with two pending criminal cases. When Mr. Schamel refused, Shaffer signed the affidavit. But Shaffer continued to send messages expecting Mr. Schamel's help with his criminal cases and in obtaining immunity for him in the Horner case.

Detective Alex also testified at the second PCR hearing, confirming that Shaffer was not given access to police reports or to any significant details about the shooting, and that, while he may have had the file with him during the interviews, the meetings took place in a controlled visitation room where they were separated by a glass partition.

The state PCR court credited Shaffer's testimony at the PCR hearing, as well as Detective Alex's testimony, and rejected the claim.

> [Horner's] allegation of error is based upon Shaffer's affidavit which was executed at a time when Shaffer was unemployed and facing criminal charges in two separate jurisdictions. He repeatedly requested money from Martin and then sought legal help from [Mr. Schamel] in exchange for signing an affidavit in support of [Horner's] effort to obtain postconviction relief. During the same time period, Shaffer was serving as a paid confidential narcotics informant in Baltimore City and Baltimore County. He was also a long-time drug addict who entered residential drug treatment within months of signing the affidavit.

> [Horner's] attorneys have painted Shaffer as an opportunist. And, he is. He reached out to narcotics Detective [Hann] when he was incarcerated with [Horner] in 2005-2006 because he saw an opportunity to help himself

35

after talking with [Horner] about what happened the morning Laraine . . . was shot. And, at trial he was questioned about his agreement with the State, his work as a narcotics informant, his felony convictions and other credibility issues.

Shaffer has traded on information with police . . . and served as an informant for many years. When approached by [Horner's] lawyer and investigator, he saw an opportunity to get money or something else of value. It is clear from the totality of the text messages that Shaffer signed the affidavit with the expectation of receiving something of value. When Schamel failed to assist him in his criminal cases or arrange for a grant of immunity, Shaffer told Ms. Martin that he would "be recanting that statement. . . ."

In addition, . . . the Shaffer affidavit states: "I have a tremendous amount of guilt and stress relating to my false testimony." In light of Shaffer's history, his status in the fall of 2015 and the circumstances which led to his execution of the affidavit, the suggestion that he signed the affidavit because he was motivated by a guilty conscience is simply unbelievable.

By contrast, Detective Alex's testimony was credible and consistent with his trial testimony. . . . Detective Alex denied providing any information or police reports to Shaffer.

J.A. 2322-23.

These are quintessential witness-credibility findings which demand special deference on federal habeas review. *See Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). Such "factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Baum v. Rushton*, 572 F.3d 198, 210 (4th Cir. 2009) (alteration and internal quotation marks omitted). And we will not overturn the court's credibility judgments unless its error is "stark and clear." *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008). There is no such "stark and clear" error here. The state court's adjudication of the claim was reasonable and, therefore, Horner is not entitled to habeas relief based upon Shaffer's affidavit.

## 2. Laraine's Affidavit

Horner's *Brady* claims based upon Laraine's affidavit fare no better. Laraine signed an affidavit prepared by Mr. Schamel on January 9, 2017. Laraine claimed that she had no independent memory of the events of October 15, 2005, and that she told Detective Alex and Ms. Schiffer that she did not. Laraine also claimed that her testimony was based upon information provided to her by Detective Alex and Ms. Schiffer. The affidavit was signed after Mr. Schamel and his investigator made unannounced visits to Laraine's home and in the wake of contradictory emails between Laraine and Mr. Schamel about Laraine's testimony. By May 2, 2017, Laraine had executed a second affidavit recanting her prior affidavit and reaffirming her trial testimony. Laraine claimed that she felt pressured during her interactions with Mr. Schamel regarding the January 9 affidavit, and that she feared that she would face prosecution or other adverse action if she refused to sign it.

Laraine also testified at the state PCR hearing. Laraine testified that she has undergone forty surgeries and has been diagnosed with post-traumatic stress disorder since the 2005 shooting, and she has been prescribed Trazadone and Seroquel as part of her treatment. She also elaborated on the reasons why she felt pressured by Mr. Schamel and Ms. Martin when they came to her home. According to Laraine, Mr. Schamel told her that she might go to prison for perjury. Mr. Schamel also accused Laraine of lying about her communications with her daughter in Ireland via Skype, and called into question whether Laraine owned the deed to her home; accusations which, as the PCR court aptly observed, had nothing to do with the postconviction case. Like Shaffer, Laraine testified that Detective Alex and Ms. Schiffer did not provide her with police reports or tell her what to

say, and she denied that she told them that she did not remember the shooting. For her part, Ms. Martin testified that she and Mr. Schamel made two unannounced visits to Laraine's home, but denied that they threatened Laraine or that she appeared to be distressed by their visits.

The state PCR court evaluated the evidence and testimony presented to it and, again, made reasonable credibility determinations. In sum, the court credited Laraine's original trial testimony and her testimony at the state PCR hearing, and accepted her explanation as to why she signed the January affidavit.

> It strains credulity to believe that Mr. Schamel and Ms. Martin were unaware of Laraine['s] vulnerability when they appeared on her doorstep in Utah on two separate occasions unannounced. After disfigurement, multiple surgeries, and a PTSD diagnosis, at a minimum, they should have insisted on [Laraine] consulting with independent counsel before executing the January 9, 2017 affidavit. This court finds credible Laraine['s] description of the tactics used by Mr. Schamel and Ms. Martin in order to obtain her signature on the January 9, 2017 affidavit. She testified that she felt pressured to sign it. She has disavowed the January 9, 2017 affidavit by signing a second affidavit on May 1, 2017 and through her testimony during the postconviction hearing.

J.A. 2329. Again, such credibility determinations rest squarely with the state courts to make and cannot be overturned on federal habeas relief unless they rise to the level of "stark and clear" error. *Elmore*, 661 F.3d at 850 (internal quotation marks omitted). Horner has failed to show that the state PCR court's credibility determinations or its adjudication of the claim was unreasonable and, therefore, he is not entitled to federal habeas relief.

C. Horner's Alleged Confession to Other Deaths

Horner's final *Brady* claim is that the State failed to disclose that Detective Alex had investigated and debunked Shaffer's claim that Horner had confessed to being responsible for other deaths. Horner has procedurally defaulted this claim and, even if he had not, it is without merit.

Detective Alex met with Shaffer at the jail on three occasions prior to trial. In written reports from these meetings, it appears that Horner had also told Shaffer that he was "responsible for a fatal fire which caused the death of his five month old daughter and the overdose death of his ex-girlfriend." J.A. 555 n.6. During Horner's trial, the prosecutor attempted to explore this information with Detective Alex, but Horner's trial counsel objected to the testimony on the grounds that it would prejudice the defense. Horner's objections were sustained. Horner's state postconviction counsel raised no claim, in either the first or second round of postconviction proceedings, regarding these other deaths.

Horner nevertheless claims that he is entitled to federal habeas relief because Detective Alex testified, in the second round of PCR proceedings, that he had relayed this information to Baltimore City Homicide, and that the deaths had been ruled accidental. We disagree. Detective Alex's testimony, such as it was, was given in the course of a state PCR proceeding which did *not* involve any such claim. Horner first sought to raise the claim in his application for leave to appeal the state PCR court's denial of postconviction relief on the claims that he *had* raised. This is not how AEDPA works. Horner did not investigate or raise this claim during his first round of state postconviction proceedings. Horner did not raise this claim in his initial federal habeas proceedings or rely upon it as a basis to reopen the state habeas proceedings. Nor did Horner investigate or raise this claim

39

during the second round of his state postconviction proceedings. Moreover, the second PCR hearing concluded on March 8, 2018. The state PCR court did not issue its final decision until September 18, 2018. In the interim, Horner took no steps to add the claim or reopen the hearing to explore it. Because Horner failed to properly exhaust the claim under state law, he has procedurally defaulted federal habeas review of it.

The claim is also without merit. Horner's supposed confession to these "other deaths" was disclosed to trial counsel, who actively resisted the State's attempt to explore the subject. Horner's state postconviction counsel did not raise a claim based upon the information or explore it in the first postconviction proceedings. The entirety of the claim seems to be nothing more that Horner telling Shaffer that he was responsible for a fire that may have led to the deaths of his child and his ex-girlfriend. The fact that the investigating officers with the Baltimore City police ruled the deaths accidental does not call into question Shaffer's credibility in any meaningful way, nor is there any reasonable probability that this tidbit of additional information would have led to a different result.

## VI. *Strickland* Claims

We turn briefly now to Horner's *Strickland* claims, which the district court dismissed without prejudice because the court granted habeas relief based upon Horner's *Patton* and *Brady* claims. After the district court issued its opinion, the State moved to alter or amend the judgment, suggesting that the district court's denial of the *Strickland* claims without prejudice raised a question as to whether the court's order was a final judgment. The district court denied the motion.

As the parties point out, several of our sister circuits have held that a district court order granting habeas relief is ordinarily considered a final judgment, even if the district court declined to address some of the habeas claims. *See Sprosty v. Buchler*, 79 F.3d 635, 645 (7th Cir. 1996) (citing cases). We agree that the district court's order is final for purposes of appeal. However, we reiterate the "important interests of federalism and comity" to state courts that AEDPA serves. *Woods*, 575 U.S. at 316. The postconviction process is often long and drawn out, involving multiple layers of legal counsel representing the petitioners. This case proves the point as well as most. For these reasons, and with due regard for the principles of finality, we think it is the far better practice for district judges to rule on all grounds presented in a petition. Except in the most unusual situations, the piecemeal resolution of claims is inconsistent with AEDPA's goal of ending unreasonable delays in the adjudication of federal habeas petitions and runs counter to the State's interest against unduly protracted federal interference in the finality of its judgments.

## VII. Conclusion

For the foregoing reasons, we vacate the district court's grant of federal habeas relief based upon Horner's *Patton* and *Brady* claims. Because the district court declined to consider Horner's claims of ineffective assistance of counsel under *Strickland*, and dismissed them without prejudice, we vacate this judgment as well. We remand to the district court to consider these claims in the first instance and encourage the district court to do so expeditiously.

*VACATED AND REMANDED*

41